# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

EMELY SANTIAGO,  )
                Plaintiff,  )
                        )
                        )
        v.  )        **CIVIL ACTION**
                        )        **NO. 3:18-01996-DHH**
ANDREW SAULT,  )
Commissioner of Social Security Administration,  )
              Defendant.  )
                        )

## ORDER

**October 30, 2020**

Hennessy, M.J.

    The Plaintiff, Emely Santiago, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Disability Insurance Benefits ("DIB"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #1). The Commissioner seeks an order affirming his decision. (Docket #30). This matter is now ripe for adjudication.

    For the reasons that follow, the Commissioner's decision is AFFIRMED. The case is hereby DISMISSED.

I.      BACKGROUND

A.      Procedural History

    Santiago filed an application for DIB on July 13, 2014, alleging that she had been disabled since February 28, 2013. (Tr. 517). The application was denied initially and on reconsideration.

(Tr. 125-31).  Following a hearing, the ALJ rendered a decision unfavorable to Santiago on March 21, 2017.  (Tr. 85-94).

The ALJ found that Santiago had not been disabled from February 28, 2013, through the date of the decision.  (Tr. 93).  On November 20, 2018, the Appeals Council denied Santiago's request for administrative review, making the ALJ's decision final and ripe for judicial review. (Tr. 1-5).   Having timely pursued and exhausted her administrative remedies before the Commissioner, Santiago filed a complaint in the United States District Court for the District of Puerto Rico on December 21, 2018, pursuant to 42 U.S.C. § 405(g).  (Docket #1).  On April 27, 2020, Santiago filed a memorandum of law in support of reversal or remand.  (Docket #26).  The Commissioner filed a memorandum in opposition on July 10, 2020.  (Docket #30).

B.      Personal History

At the time that she claims she became disabled, Santiago was thirty-five years old.  (Tr. 517).  She is married and has one child.  (Tr. 517-18).  Santiago speaks Spanish and cannot speak or understand English.  (Tr. 534).  She completed two years of college, training in physical therapy. (Tr. 536).

Santiago was employed as a physical therapist assistant until February 2013.  (Tr. 536). She also had previous work as a cashier at a supermarket.  (Id.).

C.      Medical History[1]

On June 23, 2013, Santiago visited Dr. Mariella Rodriguez reporting progressive hearing loss, worse in the right ear, that had onset over several years.  (Tr. 638).  She also reported suffering

---

[1] In addition to the evidence discussed below, there are medical records included in the transcript to which Santiago refers in her memorandum that post-date the ALJ's decision.  This additional evidence does not relate to the period at issue and does not affect the ALJ's decision about whether Santiago was disabled beginning on or before March 21, 2017.  Therefore, it will not be considered by the Court.  If Santiago wanted the Commissioner to determine whether she was disabled after March 21, 2017, she was required to file a new application for benefits.

from dizziness.  (Id.).  Dr. Rodriguez found that Santiago presented with a moderate-to-severe sensorineural hearing loss for the right ear and a mild-to-moderate sensorineural hearing loss for the left ear with good discrimination ability in both ears.  (Id.).  Dr. Rodriguez recommended that Santiago be evaluated for hearing aids.  (Id.).  On July 10, 2014, Santiago, reporting frequent dizziness, underwent an audiological evaluation by Carol M. Jiménez.  (Tr. 347).  The audiologist found sensorineural hearing loss, from moderate to moderately severe, good functioning of the middle ear, and bilateral cochlear dysfunction.  (Id.).  On September 24, 2015, Santiago had an audiology evaluation to auscultate her current state of hearing.  (Tr. 332).  Santiago presented wearing hearing aids in both ears and reporting symptoms of difficulty recognizing distant speech and hearing the television at an adequate volume.  (Id.).  She also reported episodes of vertigo. (Id.).  The audiology report revealed sensorineural hearing loss from mild to severe in both ears, moderate hearing difficulty for communication purposes, and excellent bilateral speech recognition ability in silence.  (Id.).  An audiological evaluation completed by Dr. Rafael A. Crespo on March 22, 2017 noted moderate to severe sensorineural hearing loss and good speech discrimination in both ears.  (Tr. 52).  A January 25, 2018 evaluation revealed moderate to severe sensorineural hearing loss in both ears, good speech recognition ability in the right ear and fair speech recognition ability in the left ear.  (Tr. 10).

Medical Records from Salud Integral en la Montaña show that Santiago received treatment for infection of the right foot big toe, hearing loss, bilateral breast cyst, lower back pain, left hip and leg condition, dizziness, balance issues, leukopenia, and hyperlipidemia.  (Tr. 270, 274).  X-rays of the lumbar spine taken on February 20, 2015 showed paravertebral muscle spasm.  (Tr. 272).  An ultrasound of the breasts dated November 11, 2016 showed multiple bilateral cysts.  (Tr.

878).  These were noted to be benign.  (Id.).  On December 15, 2015, a study report at the Hospital de la Concepción Centro Imágenes revealed an apparent obstructed right fallopian tube.  (Tr. 880).

Santiago reported that her psychological symptoms began in 2009, when she started having difficulties in her workplace following her pregnancy.  (Tr. 240, 196).  Santiago was breastfeeding but was denied the ability to prepare her breast milk at work causing marked tension with her co-workers.  (Id.).  She felt pressured and forced to resign.  (Id.).

Santiago first sought mental health treatment on March 9, 2011 at the APS mental health clinic ("APS").[2]  (Tr. 187).  On September 26, 2011, she was seen by Dr. Vanessa Ramirez Zapata. Dr. Zapata observed that Santiago presented clean and alert and in a calm mood.  (Tr. 265).  Dr. Zapata noted that Santiago had adequate affect, insight, judgment, appetite, libido, and sleep pattern.  (Id.).  Dr. Zapata did not consider Santiago to be at risk for suicide.  (Id.).  Santiago was prescribed Vistaril and Prozac.  (Tr. 273).  Santiago continued to receive treatment on a monthly basis at APS until January 13, 2012, when she was directed to follow-up in three months.  (Tr. 257).

Following her July 13, 2012 appointment at APS during which she exhibited a depressed, anxious, and tearful mood and showed dull affect, poor insight, and poor judgment due to phobias regarding work, Santiago's Prozac dosage was increased and she was directed to return to monthly appointments.  (253-54).  At her next appointment on August 16, 2012, Santiago exhibited a calm mood and her affect, insight, and judgment were deemed adequate.  (Tr. 251).  Following a similar

---

[2] The ALJ's decision states that Santiago first received treatment on September 26, 2011.  (Tr. 90).  While Santiago first received treatment at to the APS Mental Health clinic in Yauco on September 26, 2011, (Tr. 189), she began treating at the APS mental health clinic in Naranjito on March 9, 2011 following her relocation.  (Tr. 187, 399).  No treatment notes at either APS mental health clinic location prior to September 26, 2011 are included in the transcript. The ALJ's error is not material.

4

presentation at an appointment on October 16, 2012, Santiago's appointment frequency was changed back to every three months. (Tr. 247-48).

At her April 11, 2013 appointment at APS, the first following her alleged onset date, Dr. Zapata noted that Santiago was cooperative, coherent, had an appropriate affect, her behavior was appropriate, and that she exhibited sadness. (Tr. 243). Santiago was fully oriented with intact memory, good judgment, and adequate insight and concentration. (Id.). No thoughts of suicide were reported. (Id.). Santiago continued to be prescribed Prozac and Vistaril. (Tr. 244). She was directed to follow up in three months. (Id.). Santiago was next seen on July 11, 2013. (Tr. 241). In contrast to the prior appointment, Santiago did not exhibit sadness. (Id.). No other changes were noted. (Tr. 241-42). At her next appointment on October 24, 2013, Santiago reported that she had tried to return to work but had been reminded of past work-related trauma causing her to feel anxious and experience palpitations. (Tr. 240). She noted that she feels something bad is going to happen and that she could not tolerate the feeling. (Id.). Santiago cried while recounting her troubles with breastfeeding at work. (Id.). Santiago stated that she could not tolerate being where there were secretarial personnel or closed in places. (Id.). She was prescribed Fluoxetine, Lorazepam, and Ativan in addition to an increased dose of Prozac. (Tr. 238, 240). The Vistaril was discontinued. (Id.).

Santiago did not seek treatment again until July 11, 2014. (Tr. 187). At that APS appointment, she exhibited appropriate hygiene and attire, presented in a normal mood, acted in a calm manner, had normal affect, exhibited no attention disorder, was fully oriented, had intact memory, showed adequate concentration, exhibited good judgment, and had adequate insight. (Tr. 225-26). Santiago was diagnosed with a major depressive disorder, recurrent without psychotic

features.  (Tr. 227).  Her condition was noted as stable and her progress as improving. (Tr. 226).

She was prescribed Zoloft, Ativan, and Prosom.  (Id.).

On August 4, 2014, Santiago completed a function report on her own behalf.  (Tr. 133-40).

Santiago reported that she prepares her family's meals, takes care of her daughter, cleans the house,

does laundry, grocery shops on a weekly basis for two hours, and attends church on a weekly basis.

(Tr. 134-37).  Santiago denied spending time with others either in person or on the phone.  (Tr.

137).  Santiago stated that her conditions had not affected her ability to handle money and that she

had no problem with personal care.  (Tr. 134, 136-37).  She reported that she could walk for fifteen

minutes before needing to stop to rest for five to six minutes, could pay attention for thirty minutes,

finished what she started, was able to follow written instructions, and that her ability to follow

spoken instructions was dependent on the tone of voice and pace of the speaker.  (Tr. 138).

Santiago stated that she was not able to follow orders, cannot be cooped up at work, had difficulty

handling changes in routine, and avoids crowded places.  (Tr. 138-39). She reported difficulties

sleeping including nightmares and panic attacks.  (Tr. 134).  She also stated that she spends some

days crying due to her panic attacks, and other days she does not care about anything around her.

(Tr. 138).

At a follow-up visit at APS on August 18, 2014, the physician noted no changes from her

last appointment other than a replacement of the Prosom with Ambien.[3]  (Tr. 235).

Santiago underwent a consultative psychiatric evaluation completed by Dr. Carlos I.

Maldonado Santos on September 5, 2014.  (Tr. 194-98).  Santiago reported experiencing sadness,

---

[3] The transcript reflects two different progress notes for the August 18, 2014 visit.  (Tr. 235, 239).  A comparison of the translated notes with the original notes reveals that the notes on page 239 of the transcript are not actually from August 18, 2014 but are instead dated September 24, 2013.  (Tr. 239, 722).  However, this also appears to be in error and should actually read October 24, 2013 as Santiago's three-month follow-up scheduled would have dictated an appointment in October and she did in fact have an appointment on October 24, 2013.

anhedonia, irritability, fragmented sleep, loss of energy, loss of appetite, episodic weight loss, loss of concentration, low self-esteem, worthlessness, social isolation, decreased sexual desire and libido, anger, frustration, and feelings of rejection. (Tr. 194-95). She stated that she had suicidal thoughts with plans of pill ingestion or cutting herself. (Tr. 195). Santiago also reported suggestive symptoms of anxiety such as restlessness, anxious overeating, excessive preoccupations with everyday tasks or situations, increased muscle tension, and bruxism in addition to being easily startled and jumpy. (Id.). She recalled suffering from a partial facial paralysis during an episode of anxiety. (Id.). Santiago reported suffering from panic attacks occurring once a week for hours during which she experienced feelings of doom, palpitations, sweating, feelings of choking, lightheadedness, fear of loss of control, chills, and irritability. (Id.). Santiago noted that she could bathe unassisted but that she had no motivation with respect to her self-care or grooming. (Tr. 196). She reported that she was unable to drive a motor vehicle or use mass transportation, that she could buy groceries with assistance and did so once or twice a month, was able to prepare simple meals, could pay bills on time, was able to manage finances, could administer her own mediation, and was able to manage household chores. (Id.). Dr. Maldonado noted that Santiago presented a normal thought process, seemed attentive and was able to follow conversations without difficulty but had to read the lips of the interviewer, and had adequate judgment and introspection. (Tr. 197-98). Dr. Maldonado observed that Santiago had a thought content of low self-worth, automatic negative thoughts, rejection, and guilt. (Tr. 197). Dr. Maldonado diagnosed Santiago with major depressive disorder recurrent and severe without psychotic features, hearing loss, rule out generalized anxiety disorder, rule out somatoform disorder not otherwise specified. (Tr. 198). His prognosis was guarded. (Id.).

Santiago had a follow-up appointment at APS on September 16, 2014. (Tr. 221). She was noted to have a calm, cooperative, friendly attitude; no attention disorder; a normal state of mind; a depressed affect; normal impulse control; a logical, relevant, and coherent thought process; to be oriented to time, place, and person with an intact memory, adequate concentration, fair judgment, and adequate insight. (Tr. 221-22). Santiago's progress was listed as stable. (Tr. 222). Santiago continued on Zoloft and Ativan and replaced the Ambien with Prosom. (Id.). Santiago followed up with APS on October 16, 2014 at which time she mentioned she was experiencing improvement. (Tr. 298-99). Her affect was upgraded to appropriate and her judgment was improved to good. (Tr. 298-99). Her progress was noted as stable. (Tr. 299). Santiago's next appointment at APS was on November 13, 2104. (Tr. 217). Her judgment was noted as fair but, in all other respects, her conditions remained the same. (Tr. 217-18). Santiago's progress was described as improving. (Tr. 218).

On November 15, 2014, Santiago's friend and sister-in-law, Kathy Echevarria Rivera, completed a third-party function report on behalf of Santiago. (Tr. 149-56). Rivera stated that she and Santiago spend an afternoon together every two months. (Tr. 149). She noted that Santiago gets very nervous, loses control when faced with abrupt changes in routine, and is always afraid that something bad will happen. (Id.). She also observed that Santiago has difficulty understanding instructions and giving explanations. (Id.). Rivera stated that Santiago typically cooks all meals for her family, is the primary caregiver for her five-year-old daughter, homeschools her daughter for about four hours a day, and does housework. (Tr. 150). Rivera noted that Santiago participates in Jehovah's Witnesses church activities twice a week and goes out shopping about twice a month. (Tr. 152-53). Rivera observed that Santiago's conditions did not interfere with her personal care but did cause her difficulties with sleeping. (Tr. 150). Rivera stated that Santiago

could walk for fifteen minutes before resting, could pay attention for twenty to thirty minutes, could follow written directions if not distracted, and had trouble following spoken instructions. (Tr. 154).

On November 16, 2014, Santiago's neighbor Dimarys Nieves completed a third-party function report on her behalf. (Tr. 157-64). Nieves stated that she saw Santiago almost every day and that the two got together for homeschooling activities. (Tr. 157). Nieves noted that Santiago meets with Jehovah's Witnesses twice a week, goes to preach occasionally, attends a homeschooling group, and shops once a month. (Tr. 160-61). Nieves stated that Santiago prepares meals and cleans on a daily basis. (Tr. 159). Nieves observed that Santiago gets nervous under pressure, is anxious, and is always afraid. (Tr. 157). Nieves stated that Santiago homeschools her daughter and spends almost every day locked inside her house until she picks up her husband. (Tr. 158). While she noted that Santiago's conditions did not interfere with her personal care, Nieves stated that Santiago had problems sleeping due to her conditions. (Tr. 158). Nieves observed that Santiago could walk fifteen minutes before needing to stop and rest for fifteen to twenty minutes, could pay attention for twenty minutes, could follow written instructions without distractions, and could follow spoken directions only if they were spoken calmly and there was no pressure. (Tr. 162).

On December 12, 2014, Santiago had a follow-up appointment at APS at which she mentioned improvement in her mood. (Tr. 290-91). Her condition remained the same and her progress was noted as stable. (Id.). Santiago's next appointment at APS was on February 9, 2015. (Tr. 318). Santiago's chief complaint was anxiety, rating the present level at an intensity of nine out of ten with ten being the maximum/worst. (Id.). She described her mood as a seven out of ten. (Id.). Santiago reported that her symptoms of depression and anxiety benefited from treatment

with Zoloft and that she experienced drowsiness and dizziness from the Ativan for her anxiety. (Id.). She noted that she sleeps well. (Id.). Her mood was observed to be anxious and her judgment was noted as good but her insight was decreased. (Tr. 319-20). She was continued on the Zoloft and Ativan and the Prosom was replaced with Temazepam. (Tr. 320). At a follow-up appointment at APS on March 21, 2015, Santiago's mood had improved to normal, her judgment had decreased to fair, and her insight was found to be diminished. (Tr. 314-15). She was oriented to time. (Tr. 315). She was continued on Zoloft and Ativan and her Temazepam was replaced with Restoril. (Id.). Santiago's next appointment at APS was on June 26, 2015 at which she noted nostalgia and anxiety due to the stressors or moving and financial issues. (Tr. 327-28). Her mood was noted as anxious, but her judgment had improved to good. (Id.). She was now oriented to time, place, and person. (Tr. 328). She was continued on the Zoloft and Ativan and the Restoril was replaced with Temazepam. (Id.). Santiago followed up at APS on September 19, 2015. (Tr. 322). Her condition was unchanged except her mood had improved to normal; her judgment had decreased to fair; and she was oriented to time, place, person, and situation. (Tr. 323-24).

In November of 2015, Santiago began treatment with the Wellness Center Ponce Health Sciences University ("Ponce Health") complaining of feeling sad with crying spells every day and occasionally feeling anxious.[4] (Tr. 388). She reported intense mistrust of everyone. (Id.). At a follow-up with Ponce Health on January 19, 2016, Santiago reported having panic attacks. (Tr. 377). On February 18, 2016, Santiago reported that she was not as stressed out and had spent some time with her child. (Tr. 361). At that appointment, she completed a patient health questionnaire noting that, in the past two weeks, she had no problems sleeping or concentrating on activities.

---

[4] Many of the Ponce Health records are indecipherable and, therefore, they will not be discussed in great detail. (Tr. 352-95).

(Tr. 372).  She indicated that on several of those days, she had little interest or pleasure in doing things; was tired; felt bad about herself; and felt sad, depressed, or hopeless.  (Id.).  When asked how difficult these problems had made it for her to work, take care of things at home, or get along with others, she responded "Very difficult."  (Id.).  Santiago's score on the questionnaire indicated "Minimal Depression" which implied remission of the depression.[5]  (Tr. 373).  On March 18, 2016, Santiago completed another patient health questionnaire.  (Tr. 366).  Santiago noted that she now felt tired or had little energy nearly every day and was experiencing appetite issues and trouble concentrating on activities several days over the previous two-week period.  (Id.).  Santiago noted that these problems made it "Somewhat difficult" to either do work, take care of things at home, or get along with others.  (Id.).  Santiago's responses indicated "Mild Depression."  (Tr. 373). Santiago followed up with Ponce Health on July 8, 2016, complaining of Bruxism and marked anxiety relating to moving to her father-in-law's house due to financial difficulties.  (Tr. 352). Santiago also complained that her medications made her feel numb and unable to express and feel her feelings.  (Id.).  Due to the pain of the Bruxism, she was not sleeping well.  (Id.).  On November 15, 2016, Santiago followed up at Ponce Health.  (Tr. 356).  She reported that she continued with a depressed mood and continued to worry.  (Id.).  Santiago, who was taking Sertraline and Mirtazapine, reported "good tolerance after last medication optimization."  (Id.).  She also reported having a good appetite and sleeping well.  (Id.).  Santiago was observed to be calm and alert with a cooperative attitude, normal mood, appropriate affect, no memory impairment, fully oriented, with sound judgment and superficial insight.  (Tr. 357-58).  Santiago was assessed to have moderate anxiety and depressive symptoms.

---

[5] An updated patient health questionnaire completed by Santiago scored as "Moderate Depression."  (Tr. 374-75). Based on the sequence of the documents in this exhibit, it appears that this questionnaire was completed prior to the February 18, 2016 questionnaire.

D.     State Agency Opinions

1. Physical

On August 15, 2014, Dr. Florentino Figueroa, a State agency medical consultant who reviewed the record, opined that Santiago's only physical functional limitations related to her hearing which was limited in both ears.  (Tr. 403).  Dr. Figueroa determined that Santiago would need to avoid activities in which a complete normal hearing was necessary.  (Id.).

Dr. Lourdes Marrero, another State agency medical consultant, reviewed the record and on December 9, 2014, affirmed Dr. Figueroa's opinion.  (Tr. 414-15).

2. Mental

On September 9, 2014, Dr. Luis Umpierre, a State agency psychological consultant reviewed the record and opined that Santiago's mental impairments were not severe and resulted in at most mild restrictions.  (Tr. 401).

Dr. Jesus Soto, a State agency psychological consultant, reviewed the record and concluded on December 8, 2014 that Santiago's mental impairments were not severe and resulted in at most mild limitations.  (Tr. 415-16).

E.     Hearing Testimony

A hearing before an ALJ was held on March 1, 2017, where Santiago, represented by an attorney, and a vocational expert gave testimony.  (Tr. 101-11).

Santiago testified that she lives with her husband and daughter.[6]  (Tr. 105).  Her husband works part-time.  (Id.).  She indicated that she cleans the house depending on how she is feeling.  (Tr. 107).

---

[6] While there is one instance in the hearing transcript where Santiago refers to her son, the child is referred to elsewhere in the hearing transcript and the medical record as her daughter.  (Tr. 105, 107, 134).  It appears that she has only one child.

Santiago testified that she has genetic hearing loss that developed during her pregnancy in 2008. (Tr. 105-06). She also has experienced depression since 2011 for which she receives psychological and psychiatric treatment. (Tr. 106). Santiago takes medication to treat her depression, which she stated made her numb and lowered her energy level. (Tr. 106-07).

Santiago denied having personal relationships with friends or family, testifying that she prefers solitude. (Tr. 107). She noted that she does not sleep well due to nightmares and panic attacks. (Id.). Santiago is able to clean the house but stated that she could not do anything when she is experiencing a panic attack. (Id.).

Following Santiago's testimony, the ALJ asked a vocational expert for her assessment on the skill and exertional levels of Santiago's work history. (Tr. 108). The ALJ asked the vocational expert to consider the following hypothetical individual:

> a young person [of Santiago's age, education, and work experience] [with] the following functional limitations, she has to avoid work that includes instructions or tasks that are complex or detailed. She can use her judgment to understand, remember and carry out instructions and tasks that are short, simple and repetitive. Can respond appropriately to coworkers and supervisors and usual work situations and changes in the work routine frequently, but can only help the public occasionally, the work cannot require normal bilateral auditory function[.]

(Tr. 108-09). The vocational expert responded that the hypothetical individual could perform work as a surgical instrument inspector consisting of 42,000 jobs nationally and 1,100 in Puerto Rico, as a plastic hospital product assembler consisting of 50,000 jobs nationally and 1,785 in Puerto Rico, and as a mail clerk consisting of 109,000 jobs nationally and 2,700 in Puerto Rico. (Tr. 109-10).

F.    Administrative Decision

In assessing Santiago's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled

to benefits.  See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether she is "doing substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that she is not disabled.  Id.  The ALJ found that Santiago had not engaged in substantial gainful activity since February 28, 2013, the alleged onset date.  (Tr. 87).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."   20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ determined that Santiago had the following severe impairments: "bilateral hearing loss and a depressive disorder."  (Tr. 87).  The ALJ also found that Santiago's history of bilateral breast cyst, leukopenia, and fallopian tube obstruction were medically determinable impairments, but not severe impairments.  (Id.).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that Santiago did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 88).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment,"

the ALJ must determine the claimant's RFC.  20 C.F.R. § 404.1520(e).  An individual's RFC is

his ability to do physical and mental work activities on a sustained basis, despite limitations from

his impairments.  20 C.F.R. § 404.1545(a)(1).  Here, the ALJ found:

> [Santiago] has the residual functional capacity to perform a full range of work at all
> exertional levels but with the following nonexertional limitations:  She can use her
> judgment to understand, remember and carryout short, simple, repetitive
> instructions and tasks.  She can frequently respond appropriately to supervision,
> coworkers, usual work situations and changes in a routine work setting, and only
> interact occasionally with the public.  She can only perform jobs that do not require
> normal bilateral hearing.

(Tr. 89).  The ALJ determined that Santiago's RFC precluded a return to any past relevant work.

(Tr. 92).

At the fifth step, the ALJ asks whether the claimant's impairments prevent her from

performing other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ

determined that, based upon Santiago's RFC and the testimony of the vocational expert, jobs exist

in significant numbers in the national economy that Santiago can perform.  (Tr. 92).  Accordingly,

the ALJ found that Santiago was not disabled at any time from February 28, 2013, through March

21, 2017.  (Tr. 93).

II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42

U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are

supported by substantial evidence and the Commissioner has applied the correct legal standard.

Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if

a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to

support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st

Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must

uphold the Commissioner's findings when they are supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).  Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.    ANALYSIS

A.     Listing Criteria

Santiago asserts that the ALJ erred when he found that she did not have an impairment or combination of impairments meeting, or medically equivalent to, an impairment listed in Appendix 1 of Subpart P of the Social Security Regulations.  (Docket #26 at 7).  The listings set out in Appendix 1 are descriptions of various physical and mental illnesses and abnormalities.  Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990).  To satisfy a listing, a claimant must present evidence of medical findings that meet all specified medical criteria or are equal in severity to all the criteria for the most similar listed impairment.  Id. at 530; 20 C.F.R. § 404.1526(a).  Santiago argues that the evidence of record clearly shows that she has been suffering from a depressive disorder meeting

the requirements of listing 12.04, and, therefore, the ALJ should have found her disabled at the third step of the sequential evaluation process.  (Id.).

To satisfy the criteria of listing 12.04, a claimant must meet the requirements of paragraph A and either paragraph B or paragraph C of the listing.  20 C.F.R. pt. 404, Subpt. P, App'x 1 § 12.04.  Santiago argues that she satisfied the paragraph B criteria with marked limitations in all four categories.  (Docket #26 at 8).  Paragraph B requires that a claimant demonstrate that her mental impairment resulted in a marked restriction of at least two of the following:   (1) understanding, remembering, or applying information;  (2) interacting with others;  (3) concentrating, persisting, or maintaining pace; (4) adapting or managing oneself.[7]  Id.  A marked limitation means function in that area independently, appropriately, effectively, and on a sustained basis is seriously limited.  20 C.F.R. pt. 404, Subpt. P, App'x 1 at § 12.00F.

The first paragraph B criterion, understanding, remembering, or applying information, refers to "the abilities to learn, recall, and use information to perform work activities."  20 C.F.R. pt. 404, Subpt. P, App'x 1 § 12.00E.  A marked limitation in this criterion is inconsistent with the evidence in the record.  Santiago's treatment providers consistently observed that she had an intact memory, a normal thought process, and fair to good judgment.  (Tr. 222, 226, 239, 241-43, 291, 315, 320, 324, 328, 357).  At her consultative examination with Dr. Maldonado, Santiago stated that she could manage her finances and was able to administer her own medication.  (Tr. 196).  Dr. Maldonado noted that Santiago presented a normal thought process and demonstrated adequate recent and remote memory and had normal general knowledge.  (Tr. 197).  In her function report, Santiago indicated that she was able to follow written instructions and was able to pay her bills

---

[7] A claimant may also satisfy the paragraph B criteria by showing an extreme limitation in one of these categories.  20 C.F.R. pt. 404, Subpt. P, App'x 1 § 12.04.  Santiago does not argue that she is so limited.

and manage a savings account.  (Tr. 136).  This evidence supports the ALJ's finding that Santiago's limitations with respect to this criterion were moderate.  (See Tr. 88).

The second paragraph B criterion, interacting with others, refers to "the abilities to relate to and work with supervisors, co-workers, and the public."  20 C.F.R. pt. 404, Subpt. P, App'x 1 § 12.00E.  While Santiago denied having personal relationships with friends or family, (Tr. 107), the evidence demonstrates that she spends time with friends and family and attends church and a homeschooling group on a regular basis.  (Tr. 137, 149, 152, 157, 160).  Her treatment providers also described her as friendly and cooperative.  (Tr. 221, 239, 241 243, 290, 298, 319, 327, 353, 357).  The ALJ supportably found that Santiago's limitations with respect to this criterion were moderate. (See Tr. 88).

The third paragraph B criterion, the claimant's ability to concentrate, persist, or maintain pace, refers to "the abilities to focus attention on work activities and stay on task at a sustained rate."  20 C.F.R. pt. 404, Subpt. P, App'x 1 § 12.00E.  Santiago reported that she was able to pay attention for thirty minutes and was able to finish what she started.  (Tr. 138).  She also indicated that she homeschooled her daughter four hours a day.  (Tr. 150).  On a patient questionnaire completed on February 18, 2016, Santiago stated that she had no problem concentrating.  (Tr. 372). A month later, she indicated that she only had trouble concentrating several days out of the proceeding two-week period.  (Tr. 366).  Santiago's treatment providers consistently observed her as having adequate concentration and lacking an attention disorder.  (Tr. 217-18, 221-22, 226, 235, 237, 241, 243, 290-91, 314-15, 298099 319-20, 323-24, 327-28).  Dr. Maldonado observed that Santiago was attentive during her consultative examination.  The evidence in the record supports the ALJ's decision that Santiago's limitations with respect to this criterion were moderate.  (See Tr. 88).

The final paragraph B criteria, the ability to adapt or manage oneself, refers to "the abilities to regulate emotions, control behavior, and maintain well-being in a work setting."  20 C.F.R. pt. 404, Subpt. P, App'x 1 § 12.00E.  One example of this is maintaining personal hygiene and attire appropriate to a work setting.  Id.  Santiago reported that she was able to handle self-care and personal hygiene for herself and her child.  (Tr. 134).  Furthermore, she was consistently observed to exhibit appropriate hygiene and attire and was often referred to as well-dressed.  (See, Tr. 218-28, 235-66, 352-59).  Although she reported a lack of interest in self-care and grooming to Dr. Maldonado at her consultative examination, Dr. Maldonado noted that Santiago's hygiene was adequate and that she was appropriately dressed.  (Tr. 196).  The ALJ supportably found that Santiago's limitations with respect to this criterion were mild.  (See Tr. 89).

B.      RFC Determination

Santiago argues that the ALJ improperly evaluated the opinion evidence resulting in a flawed RFC.  (Docket #26 at 9-11).  The court disagrees and finds that the ALJ's determination is supported by substantial evidence.

In the instant case, no treating source provided a medical opinion; the only medical opinions in the record are from the State agency consultant who reviewed the record and provided their expert opinions.  See SSR96-6p ("Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment (s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review.").  Both Dr. Umpierre and Dr. Soto opined that Santiago's impairments were not severe and resulted in at most mild limitations.  (Tr. 401-02, 415-16).  Dr. Figueroa and Dr. Marrero opined that Santiago's only physical functional limitations related to her hearing

impairment and that Santiago would need to avoid activities in which a complete normal hearing is necessary.  (Tr. 402-03, 417-18).  The ALJ gave all of these opinions partial weight, explaining that the record was subsequently expanded and that the expanded record revealed that Santiago was somewhat more limited than as opined by the State agency consultants.  (Tr. 90-91).

The ALJ incorporated both Dr. Figueroa and Dr. Marrero's opinions into his RFC finding by limiting Santiago to jobs that do not require normal bilateral hearing, explaining that diagnostic tests revealed that Santiago had "moderate hearing loss for [the] purpose of communication and excellent bilateral ability for speech recognition in silence" and that Santiago had been prescribed hearing aids.  (See Tr. 89-90).  Santiago fails to cite to any evidence supporting the proposition that her hearing problems required a more restrictive RFC.

Santiago also argues that the ALJ erred in determining that Santiago had an RFC to perform a full range of work at all exertional levels.  (Docket #26 at 11).  Santiago asserts that her RFC is further limited by her hypercholesterolemia, leukopenia, right big toe infection, bilateral breast cysts, lower back pain, left hip and leg condition, and obstructed right fallopian tube.  (Id.). However, Santiago fails to point to any evidence demonstrating that these impairments require greater limitations, a burden she bears at this step of the sequential evaluation process. Furthermore, even were Santiago's RFC to properly exclude heavy work, all the jobs identified by the vocational expert that Santiago could perform are classified as light work.  (Tr. 109-10). Hence, any error would not be material.

The ALJ also properly incorporated the psychological consultants' findings into the RFC by limiting Santiago to using her judgment to understand, remember and carryout short, simple, repetitive instructions and tasks; to frequently responding appropriately to supervision, coworkers, usual work situations, and changes in a routine work setting; and to only occasional interaction

with the public.  (Tr. 89).  These findings are supported by Santiago's self-reported activities of daily living, (Tr. 134-38), and by the largely unremarkable mental status examinations from every provider in the record. (Tr. 218-28, 235-66, 352-59).

The court concludes that substantial evidence supports the ALJ's RFC finding.

C.      Subjective Complaints

Santiago argues that the ALJ erred by failing to properly consider her subjective complaints, and that this error resulted in a flawed RFC.  (Docket #26 at 12-13).  The ALJ found that Santiago's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Santiago, but Santiago's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they conflicted with the RFC.  (Tr. 92).

An ALJ makes a proper credibility determination when such a determination is "supported by substantial evidence and the ALJ . . . make[s] specific findings as to the relevant evidence he considered in determining to disbelieve the applicant."  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  If the ALJ finds that a claimant's allegations of disability are not credible, the ALJ must gather "detailed descriptions of claimant's daily activities, functional restrictions, medication and other treatment for pain, frequency and duration of pain, and precipitating and aggravating factors."  Baez Velez v. Sec'y of Health & Human Servs., No. 92-2438, 1993 U.S. App. LEXIS. 12427, at *18-19 (1st Cir. May 27, 1993) (per curiam).  Known as the "Avery factors," these descriptions must be carefully

considered by the ALJ before he declares the claimant not to be credible.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986). The ALJ advanced three reasons, which touch on the Avery factors, for finding that Santiago was not fully credible.

First, the ALJ found that Santiago's activities of daily living were inconsistent with Santiago's allegedly disabling symptoms.  (Tr. 91).  "While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding."  Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010).  The ALJ noted that Santiago reported that she took care of her daughter, playing with her and homeschooling her; took care of her personal needs and medication on her own without reminders; prepared all meals and did all household chores; helped her husband in the yard; could drive a car; goes shopping; manages money, banking accounts, and pays bills; actively socializes at her church and gets along with family, friends, and neighbors; and can follow oral and written instructions.  (Tr. 91).  These findings are all supported by the record and were properly considered by the ALJ.

Second, the ALJ supportably noted that a review of the medical evidence of record confirmed a history of depressive disorder and hearing loss, but that the claimant's level of functioning was not compatible with that of a totally disabled individual.  See supra section III.A..

Finally, the ALJ discussed Santiago's subjective complaints of precipitating and aggravating factors.  (Tr. 90).  The ALJ noted that although Santiago's "post trauma depression" related to a breastfeeding issue that began in 2009, she did not receive treatment until two years after that incident.  (Tr. 90, 187, 196, 240).  She then stopped treatment on October 29, 2013, and did not continue it until July 11, 2014, four days prior to the application date.  (Tr. 90, 187, 240).  The lack of treatment was appropriately considered by the ALJ in assessing the claimant's

credibility.  See Alvarez v. Sec'y of Health & Human Servs., No. 95-1028, 1995 U.S. App. LEXIS 20436, at *4 (1st Cir. Aug. 2, 1995) (holding that gaps in claimant's treatment history were properly considered by the ALJ in discounting claimant's testimony).

D.     Step Five Determination

Relying solely on her argument that the ALJ erred in assessing her RFC, Santiago argues that the ALJ erroneously concluded at step five that she could perform other work.  (Docket #26 at 13).  As discussed supra, the ALJ's RFC determination is supported by substantial evidence. See Section III.B.  Accordingly, the court finds that the ALJ met his burden at step five.

IV.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED.  The case is hereby DISMISSED.


/s/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE